# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| CALVIN EUGENE BRYANT, JR., | ) | |
| Petitioner, | ) | Case No. 3:15-0685 |
| | ) | |
| v. | ) | Judge Crenshaw |
| | ) | Magistrate Judge Wehrman |
| | ) | |
| BRUCE WESTBROOKS, | ) | |
| Respondent. | ) | |

---

## REPORT AND RECOMMENDATION

---

## <u>INTRODUCTION</u>

This matter has been referred to the Court for Report and Recommendation. (Docs. 46, 47.) Calvin Eugene Bryant, Jr. ("Petitioner") has filed a petition for habeas relief pursuant to 28 U.S.C. section 2254. After a hung jury in his first trial, Petitioner was convicted in a second trial of two counts of selling and two counts of delivering a Schedule I controlled substance (MDMA or ecstasy) within a drug-free school zone. These charges stemmed from two drug transactions. The sale and delivery counts were merged, and Petitioner received two concurrent terms of seventeen years in prison.

Petitioner asserts several claims in his Petition, including: (1) trial counsel was ineffective for failing to request a jury instruction on the lesser-included offense of facilitation; (2) the trial court declared Terrance Knowles, the prosecution's star witness, unavailable and permitted his prior testimony from the first trial to be introduced in the second trial; (3) alternatively, counsel was ineffective for failing to adequately object to the admission of Knowles's prior testimony,

failing to request the dismissal of all charges based on Knowles's absence, or failing to request a continuance to allow additional time to secure Knowles's presence; (4) insufficient evidence supported the drug-free school zone enhancement; (5) trial counsel was ineffective for failing to cross-examine Knowles at the first trial with all available impeachment evidence; (6) trial counsel was ineffective for failing to object to the jury instruction on the school zone enhancement; (7) the trial court violated Petitioner's due process rights by giving an erroneous jury instruction that did not require the jury to find each element of the enhancement beyond a reasonable doubt; and (8) the prosecution introduced false testimony from Knowles in violation of Petitioner's due process rights.

The Court has carefully reviewed the record and the parties' arguments, and for the reasons set forth below, concludes that none of Petitioner's claims have merit except for his claim that counsel was ineffective for failing to request a facilitation instruction. As to that claim, the Court concludes that the Tennessee Supreme Court's decision that counsel was not ineffective for failing to request a facilitation instruction was contrary to and an unreasonable application of clearly established federal law, thus warranting habeas relief.

## FACTUAL BACKGROUND[1]

Petitioner's case stems from three controlled drug buys that occurred on March 4, March 21, and April 23, 2008 between a confidential informant (Terrance Knowles) and Petitioner. Petitioner was indicted on three counts of sale and two counts of the alternate theory of delivery of a Schedule I controlled substance. Each of the counts was alleged to have occurred within 1,000

---

[1] These facts are taken primarily from the opinion of the Tennessee Court of Criminal Appeals. The state court's factual determinations are entitled to a presumption of correctness on habeas review. *See* 28 U.S.C. § 2254(e)(1). While a petitioner may rebut this presumption with clear and convincing evidence, *see Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998), Petitioner has not done so.

feet of a school in violation of Tennessee Code Annotated section 39-17-432, the "Drug-Free School Zone Act."

Petitioner initially went to trial in October 2008, but the jury was unable to reach a verdict. The court declared a mistrial and, after transfer to another division, the case was rescheduled for December 2008 and ultimately retried in February 2009.

On direct appeal, the Tennessee Court of Criminal Appeals summarized the proof at trial as follows:

### State's Proof

At trial, Detective William Loucks testified that he was a detective with the Specialized Investigations Division of the Metropolitan Nashville Police Department in the Gang Unit. He explained that the Specialized Investigations Division conducts "longer term" and "more indepth" investigations, often involving federal law enforcement agencies. In early 2008, Detective Loucks became involved in an investigation of the defendant in an area where "a high distribution of narcotics" had been taking place. Detective Loucks planned to use confidential informants to make purchases, and he described how he developed the informants.

Detective Loucks testified that in February 2008, he arrested Terrance Knowles on an habitual motor vehicle offender charge, and in the process, he talked to Knowles who "gave [him] some information that [he] felt was pretty accurate [.]" Detective Loucks gave Knowles his card and contact information and told him to contact him "if [he was] interested in working when [he] g[o]t out [ .]" Knowles later contacted Detective Loucks, who met with him and another detective, and they discussed the rules and regulations for working as a confidential informant.

Detective Loucks testified that his next contact with Knowles was on March 4, 2008, when Knowles was to do a "reliability buy" of twenty pills for $140—an amount he could purchase "that wouldn't throw up any flags." Around 11:00 a.m. that day, Detective Loucks met with Knowles at an address in the Edgehill community of Nashville and gave him $140 in previously photocopied money. Detective Loucks and other detectives followed and monitored Knowles as he went to a location in a housing complex in Edgehill. Detective Loucks was not able to visually watch Knowles enter and exit the house, but he was able to monitor the transaction via the audio device with which Knowles had been wired. Detective Loucks identified a tape recording of the March 4 transaction and stated that he had since listened to it and recognized his voice as well as Knowles' and the defendant's.

Detective Loucks testified that after the transaction, he recovered the pills from Knowles and searched him. He turned the pills into the property room and submitted a request for forensic analysis by the Tennessee Bureau of Investigation

("TBI)." Detective Loucks identified "a bag of various colored pills" as the ones purchased by Knowles on March 4. He noted that Knowles was paid forty dollars, the standard rate for a reliability buy, and fifty dollars for providing intelligence on a suspected drug dealer.

Detective Loucks testified that the next transaction took place on March 21, 2008. This transaction was to be for 100 Ecstasy pills for $650. The transaction took place "[i]n the vicinity of 1305 12th Avenue South, Edgehill complex." He elaborated that it was "in the vicinity" because the defendant was not inside his residence but was standing outside. Detective Loucks described the same procedure as with the first transaction, whereby he met with Knowles, searched him and his vehicle, gave him previously photocopied money, and followed him to the intersection of 12th Avenue and Edgehill. As with the first transaction, Detective Loucks monitored and recorded the transaction on audio, while other detectives maintained visual surveillance.

Detective Loucks testified that he had since listened to the recording of the second transaction and on it recognized his voice as well as Knowles' and the defendant's. After the transaction, Detective Loucks recovered a bag of pills from Knowles, which he kept until the end of his shift when he field-tested the pills and turned them in to the property room with an analysis request form. Knowles was paid $100, the standard rate being a dollar per pill. Detective Loucks identified "a bag of various colored pills" as the ones purchased by Knowles on March 21.

Detective Loucks testified that a third transaction took place on April 23, 2008, around 10:00 p.m. Knowles told Detective Loucks that he had contacted the defendant and could purchase 200 pills for $1200. After going through the same procedures as before, Detective Loucks was able to personally observe this transaction through a pair of binoculars from a distance of 200 to 250 yards as well as listen to the audio. Detective Loucks testified that he had since listened to the recording of the third transaction and on it recognized his voice as well as Knowles' and the defendant's. After the transaction, Detective Loucks recovered "two bags of various colored pills" from Knowles and paid Knowles $200 at the standard rate of one dollar per pill. Detective Loucks transported the pills back to his office, where he conducted a field test and then turned them in to the property room along with an analysis request form.

Detective Loucks testified that in addition to the money paid for each of the drug buys, Knowles was paid an additional amount of $680 after the defendant was indicted and for items recovered pursuant to a search warrant. He was paid $100 for each of the defendant's five felony indictments, $100 for a gun recovered at the location of the defendant's arrest, and $80 for two controlled substances that were recovered. These were the standard rates for payment to informants.

Detective Loucks testified that he spoke with the district attorney about Knowles' habitual motor vehicle offender charge and "[i]t was dismissed upon [his] request," which was "[n]ot unusual ." He also contacted Knowles' probation officer in July concerning a violation because he was trying to keep Knowles out of jail "to further along the investigation." He did not make any other promises to Knowles or give him any other assistance than what he had described. He said that "[n]othing is promised at all to the cooperating individuals, except ... that I'm

responsible for their safety." Detective Loucks stated that after Knowles' identity as the confidential informant was revealed at a previous hearing, he made one additional payment to Knowles on November 6 because "[h]e had stated ... that he didn't feel safe in the current environment, so I paid him eight hundred dollars, again out of our intelligence fund, for relocation expenses."

Detective Loucks said that he did not arrest the defendant immediately after any of the three sales because they "were trying to broaden the investigation ... [and] provide more bang for the buck for the taxpaying citizens." After the defendant was arrested, Detective Loucks asked him "about him selling pills" and the defendant said that "he sold anywhere between thirty to forty pills" in a week. The defendant did not respond when Detective Loucks asked him where he was getting the pills.

On cross-examination, Detective Loucks acknowledged that he did not record any of the conversations between Knowles and the defendant about setting up the transactions. He stated that the confidential informant contract states that "they are not to induce any individuals who are not predisposed to committing a crime." Detective Loucks acknowledged that the audiotape of the first transaction reflected that Knowles made several phone calls and no one answered. With regard to the second transaction, Detective Loucks agreed that the Ecstasy pills were delivered by a third individual, and Special Agent Mark Shafer observed the transaction, but he was not in a position to see it. Detective Loucks said that Knowles returned from the exchange with ten dollars more than he had been expecting.

Detective Loucks testified that the controlled substances that were recovered when the defendant was arrested did not come from the defendant's home but were found on the awning of the porch across from the defendant's home. Someone other than the defendant was seen throwing the package of substances onto the awning and running away. With regard to his conversation with the defendant regarding how many pills he sold a week, Detective Loucks acknowledged that he did not record the statement or have the defendant submit anything in writing.

Detective Loucks testified that sometime after the first trial in this case, he appeared at Knowles' probation violation hearing, and Knowles was released "a period of time later" and given money to relocate. Knowles was apprised of the next court date, but Detective Loucks did not issue a subpoena because "[he] d[id] not have the power to issue a subpoena outside of an officer involved in an investigation." On continued cross-examination and redirect examination, Detective Loucks further testified about his knowledge of Knowles' whereabouts and his efforts to find him prior to trial. Detective Loucks stated that the defendant was "the leader of a set of Gangster Disciple gang members," and Knowles was "in fear for his life ... because he received threats while he was incarcerated."

Terrance Knowles testified that he was presently in custody on a probation violation. He went to court on the violation in August 2008 but left court after he was approached by defense counsel, who wanted to speak to him about the defendant's pending case. He was on a one-year probation term for the felony offense of "habitual driving offender." Knowles said that he went to jail and was

charged with the driving offense in February 2008, at which time he had a discussion with Detective Loucks about "helping each other out, something like that. He told me what he was trying to do, what he was looking for. And I said I can do that." Detective Loucks told him that he was working on "[c]leaning up the Edgehill area," and the defendant's name came up during the conversation. Knowles knew the defendant by the nickname "Fridge." Knowles agreed to work with Detective Loucks and did so three times related to the defendant.

Knowles testified that the first time, he called the defendant "the day before" and told him that he wanted to buy twenty pills. The defendant gave him the price of $140 and said to call him the next morning. Knowles knew the defendant prior to this time, already had his phone number, and recognized his voice when he called him. The next day, Knowles met with the detectives, who "put a wire on [him]," and gave him instructions on making the transaction. Knowles went to the defendant's residence in Edgehill and attempted to reach him by knocking on the door and calling him, but he received no answer. While he was outside the residence, the defendant's sister arrived, and she discovered that the defendant was asleep.

Knowles testified that the defendant's sister let him inside the house, and he woke the defendant and told him that he needed the pills. The defendant asked him how many pills he wanted and retrieved them from one of the closets. There was no one else in the bedroom at the time. Knowles and the defendant then went downstairs, and the defendant asked Knowles if he had a bag. After Knowles responded that he did not, the defendant gave Knowles a sandwich bag and put the pills in it. Knowles paid the defendant $140 for the pills and asked him the price for 100 pills for the next time. The defendant told him that it would be "[p]robably six fifty or something like that." Knowles left and met with the detectives, turning over the pills. Knowles was paid "[a] hundred dollars, something like that."

Knowles described the second time he met with the defendant while working as a confidential informant. He called the defendant "and told him [he] needed a hundred pills this time." Knowles and the defendant agreed on a time for him to come by the defendant's house. Prior to going to the defendant's house, Knowles met with the detectives to have a wire put on him. When he arrived at the defendant's house, he had to wait twenty-five to thirty minutes "for the pills to get there." A white Expedition arrived, Knowles gave the defendant his money, and the defendant walked to the passenger side of the vehicle and returned with 100 pills. Knowles received some change back from the deal. Knowles then left and met with the detectives, turning over the pills. He was paid $100 to $150 for this transaction.

Knowles testified that the day of the third transaction, he called the defendant and "told him I wanted to get two hundred this time." The defendant told him that he was "going to work on it" and that it would cost $1200. Knowles called the defendant back, and the defendant told him "the dude was on his way. And, ... I told him that I would be out there in a little bit." Knowles called the detective to "let him know he was on his way."

After meeting with the detectives, following the same procedure, Knowles went to meet the defendant by a basketball court near the defendant's house in Edgehill. Knowles waited "about an hour" until a Jeep Cherokee arrived, and the

defendant said, "[T]hey're right here." Knowles counted the money and handed it to the defendant, who went and got the pills from the person in the vehicle. The defendant returned with two bags of different colored pills, which he gave to Knowles. After he received the pills, Knowles met with the detectives and turned over the pills.

Knowles testified that Detective Loucks helped him have a driving charge dismissed in March 2008. In addition to the money he received for each transaction, Knowles also received $700 after the defendant was arrested. He did not receive any other money or benefit, nor was he promised anything in exchange for his testimony. Knowles said that he did not want to testify, and he was telling the truth about what happened on those three occasions.

On cross-examination, Knowles acknowledged that he discussed his testimony with the district attorney and Detective Loucks before the trial. He agreed that his felony habitual motor vehicle offender charge had been dismissed. After he was released from jail before the first transaction, Knowles called Detective Loucks and told him he wanted to help himself. Prior to the actual transactions, Knowles was not wired with any recording device when talking to the defendant. Knowles acknowledged that Detective Loucks told him that the target of the investigation was the defendant and to contact him when he had a deal arranged with the defendant.

Special Agent Mark Shafer with the Federal Bureau of Investigation, "FBI," testified that in the Spring of 2008, he was assigned to the Violent Crimes and Gangs Task Force and was involved in an investigation of the defendant. On March 21, 2008, Agent Shafer was working with Detective Mark Anderson of the Metropolitan Nashville Police Department in a surveillance van parked inside the Edgehill housing development. The surveillance "was all part of Detective Loucks' case." After they had been parked for some time, the confidential informant arrived, and Agent Shafer observed the informant converse with the defendant. A few minutes later, a white SUV arrived, and the defendant "walk [ed] over to the passenger side of that SUV. He had money in his hand. He handed money to the occupants of the SUV and, in turn, received a handful sized bag." The defendant then gave the bag to the confidential informant.

On cross-examination, Agent Shafer testified that he never met the confidential informant. He did not participate in locating Knowles in December 2008 or afterwards. He would have helped find Knowles if Detective Loucks had asked for his assistance.

Isaac Martinez, with the Metropolitan Nashville Police Department Property Room and Evidence Division, described the procedures for receiving evidence and transporting it to the TBI lab for analysis if requested. Martinez identified the bags of pills submitted by Detective Loucks and described how he transported them to the TBI lab for analysis in April 2008. He said that all of the bags were sealed when he left them with the TBI.

Martinez testified that one of the bags of pills was later taken to the TBI lab a second time, on October 8, 2008, by Sandra Luther who did not work in the property and evidence room. On redirect examination, Martinez noted that another bag of drugs was taken back to the TBI in October 2008 by Luther. He explained

that it was not unusual for drugs to be resubmitted to the TBI for analysis, nor was it unusual for a detective to take an item to the TBI.

Agent Jennifer Sullivan, a forensic scientist with the TBI, testified as an expert in forensic chemistry that she analyzed the pills submitted as exhibits three and five in this case. Her analysis of the twenty pills in exhibit three revealed that each of the pills was a Schedule I drug, the majority were "34 methylenedioxymethamphetamine, or MDMA, commonly known as Ecstasy and methamphetamine" and some were benzylpiperazine and methamphetamine. Agent Sullivan's analysis of the 100 pills in exhibit five revealed that some were the Schedule I substance "34 MDMA and methamphetamine," and some were the Schedule II substance methamphetamine.

Agent John Scott, Jr., a forensic scientist with the TBI, testified as an expert in the field of forensic chemistry that he analyzed the pills submitted as exhibit seven in this case. His analysis of the 200 pills that were submitted revealed that fifty-four of the pills did not contain any controlled substance, seventy-one of the pills contained the Schedule II controlled substance methamphetamine, and seventy-five of the pills contained the Schedule I controlled substance MDMA and methamphetamine.

Mary Beth Stephens, a GIS analyst for the Metro Planning Department, testified that in October 2008, she went with Detective Loucks, the district attorney, and defense counsel to the "corner of Edgehill and 12th" for the purpose of mapping the locations of the drug transactions in the defendant's case. Stephens took with her a map of the area created from aerial photographs and property line data stored in the Planning Department's database. From 12th and Edgehill, Detective Loucks directed Stephens to three separate locations. She made notations on her map of the locations and used her data to create a larger map that noted the locations of the incidents and the locations of schools within the 1000 feet "buffer zones" around the schools in the area.

Stephens identified incident number one as occurring at 1305 12th Avenue South, which was within 1000 feet of two schools, Carter Lawrence Elementary and the Murrell Special Education School. Incident number two occurred at the edge of the pavement immediately across from the housing development, and incident number three occurred at the edge of the sidewalk that led to the playground for the school. Both incidents two and three occurred within 1000 feet of the same two schools as incident one. On cross-examination, Stephens acknowledged that the incident locations noted on her map were based on locations described to her by Detective Loucks.

**Defendant's Proof**

Walter Fisher testified that he was an in-school suspension instructor at Hillsboro High School and had known the defendant for eight of the ten years he had been teaching. Fisher recalled that during the four years the defendant attended Hillsboro, the defendant never had any type of violation or was sent to in-school suspension for any reason. Fisher described the defendant's character as "impeccable," and he said that the defendant was a "model citizen" and loving

toward his family. Fisher recalled the defendant's athletic ability and success on the football team, and he described that the defendant had "always been a leader on those teams[.]" He recalled that the defendant's former head football coach, Ron Aydelott, Councilman Ronnie Greer, and the defendant's minister had testified on the defendant's behalf at an earlier hearing.

Fisher testified that he had never known the defendant to use drugs or heard any rumors of the defendant being involved with selling drugs. Fisher knew that the defendant enrolled in college at Tennessee State University instead of going elsewhere because his father had triple bypass surgery and the defendant did not want to leave him. Fisher was aware of a fight the defendant was involved in during high school. To his understanding, another student was continuously provoking the defendant on the school bus. After they got off the bus, the defendant tried to walk away but hit the other student after continued provocation. The defendant only hit the other student once and then walked away. Fisher said that aside from that one fight, the defendant "was a peacemaker at school."

On cross-examination, Fisher clarified that he had coached basketball and had not been one of the defendant's football coaches. Since the defendant's graduation from high school in 2004, Fisher had seen the defendant once every two months but saw him every day during his attendance at Hillsboro. From his observations of the defendant during his school years, Fisher believed the defendant to be a good student, an intelligent person, and a good problem solver. Fisher never saw a situation where the defendant was intimidated during football games.

Fisher testified that he thought it was "[u]nbelieveable" when he heard the defendant had been arrested for selling drugs. It would surprise him if he heard the defendant on audiotape participating in a drug transaction. Fisher had never known the defendant to carry a weapon, and it would surprise him to learn that the defendant had a prior arrest for carrying a weapon. He acknowledged that there were some things about the defendant that he did not know about. Fisher thought that the defendant being described as a confirmed leader of the Gangster Disciples was "unbelievable." Nevertheless, Fisher said that none of these revelations changed his opinion of the defendant. He agreed that his impressions of the defendant were from his four years of high school, which ended in 2004. On redirect examination, Fisher agreed that the defendant was the type of person who would do anything for a friend.

Suzanne Frensley testified that she was a teacher at Hillsboro High School and was selected as the 2007 Teacher of the Year for the State of Tennessee. Frensley had known the defendant for seven years, beginning when his mother was the caregiver for her godmother. She said that the defendant was "very generous" with her godmother and spent time watching basketball and hockey games with her. She maintained contact with the defendant after she began teaching at Hillsboro. Frensley described the defendant as "[l]arge and strong with a soft inside and a big heart." She said that he was very close to his parents and sister. She noted that he "took a great interest in the people who live in his neighborhood" and was "supportive of the community." Frensley had come to court three times to testify on the defendant's behalf and would never hesitate to do so.

On cross-examination, Frensley clarified that the defendant was never in one of her classes but described herself as his mentor and role model. Frensley noted that she taught leadership at Hillsboro and was not sure that she would have identified the defendant as a leader. She thought that "his leadership is more on a relationship level, caring about people, his family and friends." She noted that people looked up to him, but "he never stood out and said, I'm the leader, I'm the big man."

Frensley stated that she was not aware of the defendant's reputation for carrying a weapon or heard information of him being a confirmed leader of the Gangster Disciples in Edgehill. Frensley was aware of the allegations in this case and that the transactions were recorded on audiotape, but her knowledge of those incidents, although surprising to her, did not change her opinion of the defendant. Frensley acknowledged that she did not know everything that was going on in the defendant's life.

The defendant testified that he had resided with his mother in the Edgehill housing projects his entire life and attended Hillsboro High School where he was captain of the championship football team. He identified several newspaper articles chronicling his football career and described the interest he received from many colleges due to his athletic ability. Once he graduated from high school, the defendant enrolled at Tennessee State University and, while in school, worked first for *The Tennessean* newspaper and then Coca–Cola. He also applied for a job with the United States Post Office, and he had been scheduled to interview in June 2008. The defendant admitted that, at one point in college, his grades dropped and he was placed on academic probation. However, he received a letter saying that he was welcome to come back to school.

The defendant testified that he knew Detective Loucks prior to his arrest "[f]rom around the neighborhood." He said that Detective Loucks had stopped him on more than one occasion and searched him for weapons or drugs but had never found anything. On these occasions, the detective never said that the defendant had done anything wrong, "but they always come around the neighborhood and say they received calls[.]"

The defendant said that he knew Knowles from "growing up in the neighborhood," even though Knowles was seven or eight years older. He and Knowles "had a personal relationship," and Knowles had "been around the family for quite a while." The defendant acknowledged that Knowles purchased drugs from him. He explained that before the first transaction, Knowles approached him near the basketball court and asked if he "kn[e]w anybody with some pills" because he had someone wanting to buy some from him. The defendant told Knowles that he did not and that he did not "want to get involved with it." However, Knowles kept telling the defendant that he needed to get the money to feed his family and "called [him] several times ... on a day to day basis, ... [s]o, eventually, [he] gave in and helped him[.]"

The defendant testified that the day before the first transaction, Knowles called and asked if he could purchase thirty extra pills. The defendant told Knowles that he could get them, and Knowles was supposed to come by that night. "[T]he guy" brought the pills to the defendant, but Knowles did not show up that night.

The next day, the defendant was in bed asleep when his sister and Knowles came and woke him up. Knowles asked for only twenty Ecstasy pills, and the defendant gave them to him. Knowles then asked the price for 100 pills, and the defendant "gave him a price on it," which was $650. The defendant explained that he knew the price "[b]ecause in the kind of environment [he] grew up in, you'll know the prices for things."

The defendant admitted that there was a second transaction in which he sold 100 Ecstasy pills to Knowles for $650. However, the defendant did not have the pills in his possession—"[someone] brought them to [him] and [he] gave them to Terrance Knowles." The defendant admitted that after either the second or third transaction, he told Knowles to count the pills. The defendant said that the man who brought the drugs to him was someone he did not know well but "kn[e]w him well enough." The defendant noted that Knowles had called him various times between the first and second transactions and those calls were not on the audiotapes.

The defendant testified that Knowles also called him after the second transaction. The defendant explained that "[i]n between these deals, I kind of, like, was, still, I didn't want to do it[,]" but Knowles kept talking about his family and how he had helped raise him. He tried to put Knowles off by saying that he would see what he could do, but then Knowles would "eventually pop up on the scene ... [a]nd that's when [he would] just go ahead and call the individual." The defendant said that he never told Knowles on the phone to come over. After the third transaction, the defendant refused to help Knowles "[b]ecause [he] came to a conclusion that [he] didn't want to participate in it anymore."

The defendant acknowledged that he had twice been arrested for weapons possession. After his first arrest, the defendant obtained his handgun carry permit, which required that he be fingerprinted and not have any felonies on his record. With regard to the school bus assault incident when he was fifteen or sixteen, the defendant explained that the other boy kept picking on him, and they "passed words." As he was getting off the bus, the other boy came at him, so he hit him. The defendant said that he and that boy were now close friends. The defendant denied being the leader of the Gangster Disciples but acknowledged that he had been around gang members.

The defendant testified that prior to the first incident with Knowles, he had never sold drugs to anyone. The defendant explained that when he was arrested in this case, the police searched him and his house and did not find any drugs. However, on a nearby roof, the police found drugs that they believed to be his, which resulted in his being charged.

On cross-examination, the defendant acknowledged that when he was arrested, he never told the police he was just doing a favor for a friend. Prior to receiving his handgun permit, the defendant was convicted of unlawful possession of a weapon and placed on probation. His permit was revoked before his second arrest for unlawful possession, but he said he did not know it had been revoked or he would not have carried a weapon. As to the fight he was involved in as a juvenile, he said that he was charged for an aggravated assault but believed it was amended to simple assault because he did not have a felony on his record.

The defendant acknowledged that during the first transaction, Knowles asked the price for 100 pills and the defendant told him immediately $650. He further acknowledged that the recordings did not reflect his ever telling Knowles that he did not want to sell the drugs. The defendant admitted that the recording from the second transaction reflected him describing the different names for the various colored Ecstasy pills and specifically that Knowles needed to be careful with the "brown bulls" because "[p]eople could pass out on them[.]" The defendant explained that he "was telling [Knowles] what the guy told [him]." The defendant acknowledged that the recording of the third transaction reflects him telling Knowles to count the pills even though the man who delivered them was "usually good."

*State v. Bryant*, No. M200901718CCAR3CD, 2010 WL 4324287, at *1–10 (Tenn. Crim. App. Nov. 1, 2010) (footnote omitted).

The jury found Petitioner not guilty of the charges stemming from the March 4 sale, but guilty on the remaining counts. *Id.*

## PROCEDURAL BACKGROUND

Following his conviction, Petitioner appealed to the Tennessee Court of Criminal Appeals, raising five claims: (1) insufficient evidence supported his conviction because the State failed to prove that the buildings alleged to be schools were actually schools; (2) insufficient evidence because the proof at trial established the defense of entrapment; (3) the trial court erred in declaring Terrance Knowles unavailable and allowing his prior testimony to be read to the jury; (4) the trial court erred by failing to give a facilitation instruction; and (5) the trial court improperly ordered that Petitioner serve 100% of his entire seventeen-year sentence. The Court of Criminal Appeals reviewed claims 1-3 on the merits, but noted as to claim 4, Petitioner did not request the facilitation instruction, and so the court reviewed whether the trial court's failure to give the instruction constituted plain error. *Id*. at *19-20. The court ruled that it did not because that court found that it was not clear that Petitioner did not waive the issue for tactical reasons. *Id.* at *20. The court

then concluded that Petitioner's sentencing error was well-taken and affirmed his conviction but remanded for entry of corrected judgments. *Id.* at *22.

Petitioner then moved the trial court for post-conviction relief, arguing that trial counsel had been ineffective for failing to request an instruction on facilitation, which is a lesser included offense of the crimes for which Petitioner was convicted. The trial court held an evidentiary hearing at which trial counsel testified. (Doc. 12-16 at 64; Doc. 12-18.)

The trial court issued a written decision, denying Petitioner's request for post-conviction relief. (Doc. 12-16 at 64.) The trial court concluded that trial counsel's performance was not deficient because the evidence did not show that Petitioner lacked the requisite intent, nor did it show that he was conducting the sales for other people. It also concluded that Petitioner failed to establish prejudice because "[t]he jury apparently gave weight to the petitioner's defense that he was entrapped by finding him not guilty in count one for the first transaction in which the drugs were actually located with the petitioner at the time of the sale but guilty in the later transactions." (*Id.* at 67-68.)

Petitioner appealed this decision to the Tennessee Court of Criminal Appeals, which affirmed the decision. *Bryant v. State*, No. M2012-01560-CCA-R3-PC, 2013 WL 4401166, *1 (Tenn. Crim. App. Aug. 16, 2013). On appeal, Petitioner continued to argue that the trial counsel provided ineffective assistance of counsel by failing to request a jury instruction on facilitation and that the trial court erred in denying his request for post-conviction relief. *Id.* at *13. The court concluded that counsel's performance was not deficient because she made a purposeful choice not to request the instruction, hoping to secure either acquittal on the basis of entrapment or conviction of two misdemeanor offenses, rather than felony convictions of either the charged offenses or

facilitation. *Id.* at *20. The court concluded that a facilitation instruction would have been wholly inconsistent with trial counsel's theory of entrapment. *Id.* The court then noted:

> [d]espite trial counsel's admission at the postconviction hearing that she did not make a strategic decision not to request the instruction on facilitation, we conclude that, in light of her defense theory and the evidence presented in her case-in-chief, trial counsel's decision not to pursue a facilitation instruction was a strategic one, and therefore, not deficient performance.

*Id.*

Additionally, the court agreed with the trial court's decision that counsel's performance was not deficient because the evidence did not support a facilitation instruction. *Id.* at *21. The court agreed with the trial court's determination that Petitioner had the intent, at a minimum, to promote or assist in the transactions at issue. *Id.* The court further concluded that Petitioner could not show prejudice because, pursuant to previous case law, prejudice can never exist when the jury has found the defendant guilty of a greater offense. *Id.* at *22. The court affirmed the trial court's denial of Petitioner's post-conviction motion.

Petitioner appealed to the Tennessee Supreme Court. *Bryant v. State*, 460 S.W.3d 513 (Tenn. 2015). That court recognized that facilitation is a lesser included offense of the charged offenses, but it concluded that trial counsel was not deficient for failing to request the facilitation instruction because there was no evidence from which a reasonable jury could conclude that Petitioner merely facilitated the drug sales. *Id.* at 524. The court further concluded that counsel's decision not to request a facilitation instruction was a strategic decision. *Id.* at 525. The court decided that counsel's "actions at trial contradicted her statements" at the post-conviction hearing, and the trial court made no explicit findings as to her credibility. *Id.* The court further found no prejudice because it concluded that "no reasonable juror could have believed that [Petitioner] did

not intend to sell illegal drugs under the facts and circumstances of this case." *Id.* at 528. The court affirmed.

Petitioner filed this habeas petition on June 22, 2015. (Doc. 1.) On May 18, 2016, the Court appointed counsel to Petitioner, (Doc. 21), whereafter Petitioner moved to file an amended petition, which the Court permitted, (Docs. 27, 28.) Petitioner filed his amended petition on November 16, 2016. (Doc. 31.) The parties have filed their merit briefs on the issues and it is now ripe for disposition. (*See* Docs. 39, 42, 45.)

## DISCUSSION

This Court's review of this habeas petition is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). So, this Court cannot grant this habeas petition as to any claim adjudicated by the Tennessee courts on the merits unless that adjudication: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States;" or (2) "resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1)-(2). This standard is "intentionally difficult to meet." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The source of "clearly established federal law" is limited to those cases decided by the United States Supreme Court, and specifically only the holdings—not the dicta—of those cases. *See id.* When considering whether the federal law is clearly established, this Court may not rely on the decisions of the lower federal courts, *Lopez v. Smith*, 135 S. Ct. 1, 2 (2014), or any Supreme Court cases decided after the last adjudication of the merits by the state court, *Greene v. Fisher*, 565 U.S. 34, 44 (2011). As such, this Court is limited to the legal landscape as it would have appeared to the Tennessee state courts at the time of their adjudication. *See id.*

Furthermore, the "contrary to" and "unreasonable application" clauses of section 2254(d)(1) have independent meaning. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). "A state court's decision is 'contrary to' clearly established federal law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Lewis v. Curtain*, 632 F. App'x 788, 792 (6th Cir. 2015) (quoting *Williams*, 529 U.S. at 405–06).

"A state court's decision is an 'unreasonable application' of clearly established federal law if it 'identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case,' or 'if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" *Id.* (quoting *Williams*, 529 U.S. at 407). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." *Id.* (quoting *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003)). "The state court's application of clearly established law must be objectively unreasonable." *Id.*

A.    **Ineffective Assistance of Trial Counsel**

To prove his ineffective assistance of appellate counsel claims, Petitioner must show that (1) considering all circumstances, counsel's performance was so deficient that the attorney was not functioning as counsel as guaranteed by the Sixth Amendment and (2) that counsel's performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687-89 (1984). To satisfy the first prong, the "performance" prong, Petitioner must overcome the strong presumption that counsel's behavior was within the wide range of reasonable professional assistance. *Id.* at

687. Petitioner must show that counsel's behavior cannot be attributed to sound trial strategy. *Id.* at 689. To establish the second prong, the "prejudice" prong, Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

### 1. Failure to request jury instructions on lesser-included offense of facilitation

Petitioner argues that trial counsel was ineffective because she failed to request a jury instruction on the lesser-included offense of facilitation. Petitioner attacks the Tennessee Supreme Court's decision as both "contrary to" and "an unreasonable application of" clearly established federal law. For the reasons set forth below, this Court concludes that Petitioner's arguments have merit and recommends granting the writ as to this claim.

### a. Deficiency

### i. Contrary to

Petitioner argues that the Tennessee Supreme Court applied the wrong standard to the deficiency prong of Petitioner's ineffective assistance of counsel claim when it required Petitioner "to prove by clear and convincing evidence that trial counsel was deficient for failing to request a jury instruction on facilitation as a lesser-included offense." (*See* Doc. 30 at 15) (quoting *Bryant v. State*, 460 S.W.3d 513, 523 (Tenn. 2015)). Petitioner contends this standard is incorrect because a petitioner must only prove deficiency by a preponderance of the evidence. *See Higgins v. Renico*, 470 F.3d 624, 632 (6th Cir. 2006) (citing *Strickland* in support of the rule that "a defendant has the burden of proving, by a preponderance of the evidence, that 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment'"). Because the state court required a more exacting standard, Petitioner contends the state court's decision is "contrary to" clearly established federal law.

Respondent argues that the state court properly announced the *Strickland* standard at the beginning of its analysis and any reference to the "clear and convincing standard" referred to a post-conviction petitioner's burden to prove factual allegations. (Doc. 42 at 9-10.) Respondent further argues that at least one other district court has examined language similar to that used by the Tennessee Supreme Court and has concluded that such language did not render the opinion contrary to clearly established Supreme Court precedent. (*Id.* at 10.)

The answer lies in the words used by the Tennessee Supreme Court. The Tennessee Supreme Court began its legal analysis by noting that post-conviction relief was appropriate "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." *Bryant v. State*, 460 S.W.3d 513, 521 (Tenn. 2015) (quoting Tenn. Code Ann. § 40-30-103 (2012)). The court continued by noting that a defendant seeking post-conviction relief "must prove by clear and convincing evidence *the deprivation of a constitutional right*." *Id.* (emphasis added).

After identifying additional burdens of proof, the court set forth the *Strickland* standard, recognizing the deficiency and prejudice prongs. As to the deficiency prong, the court acknowledged that Petitioner must "show[] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* (quoting *Strickland*, 466 U.S. at 687). It further recognized that "[t]he reasonableness standard is objective, measured by the professional norms prevailing at the time of the representation." *Id.* (internal citation omitted). The court correctly noted that trial counsel's performance should not be evaluated using "20-20 hindsight," and it recognized the significant deference owed to potential strategic decisions. *Id.* at 522. The court then stated that "[w]ith these principles in mind, we have carefully reviewed the evidence in this case and hold that Defendant failed to prove by clear and

convincing evidence that trial counsel was deficient for failing to request a jury instruction on facilitation as a lesser-included offense." *Id.* at 523.

The court then analyzed whether failure to request the facilitation instruction constituted deficient performance, concluding first that, because there was no evidentiary basis to support a facilitation conviction, trial counsel's failure to request the facilitation instruction was not deficient. *Id.* at 525. The court then concluded that trial counsel made a conscious and strategic choice not to request the facilitation instruction. *Id.* at 526. The court concluded its analysis of the deficiency prong of the *Strickland* test by stating "Defendant has failed to prove by clear and convincing evidence that trial counsel's failure to request the lesser-included offense instruction of facilitation was deficient performance." *Id.*

Based on the above, it appears that the Tennessee Supreme Court imposed a clear and convincing standard of proof on the deficiency prong of Petitioner's *Strickland* claim. Although the state court acknowledged the proper *Strickland* analysis as to deficiency and prejudice, it then applied a clear and convincing evidentiary standard, requiring Petitioner to prove his *constitutional violation* by clear and convincing evidence. *See Bryant*, 460 S.W.3d at 521. It is true that Tennessee law requires a post-conviction petitioner to prove factual allegations by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f) (providing that "[t]he petitioner shall have the burden of proving the **allegations of fact** by clear and convincing evidence") (emphasis added). But the court did not limit the clear and convincing burden of proof solely to factual allegations. Instead, the court consistently referred to Petitioner's failure to prove deficiency itself by clear and convincing evidence. That is not the standard, as *Strickland* requires that deficiency be measured from the objective standard of a reasonable attorney, and the Sixth Circuit has acknowledged the evidentiary burden to be a preponderance of the evidence. *See Higgins*, 470

F.3d at 632. The Tennessee Supreme Court's imposition of a higher standard is thus contrary to clearly established federal law.

The case on which Respondent relies to argue against such a finding is distinguishable. In *Howell v. Hodge*, No. 2:06-cv-108, 2010 WL 1252201, *13 (E.D. Tenn. Mar. 24, 2010), the District Court for the Eastern District of Tennessee considered whether the Tennessee Supreme Court's decision was contrary to clearly established federal law because of its use of the clear and convincing evidentiary standard. That court acknowledged that the petitioner based her argument on a single sentence in which the Tennessee Supreme Court concluded that the petitioner failed to "establish prejudice by clear and convincing evidence." *Id.* (quoting *Howell v. State*, 185 S.W.3d 319, 330 (Tenn. 2008)). The district court noted that the Tennessee Supreme Court cited Tennessee Code Annotated 40-30-210(f)(1997), which provides that a petitioner must prove factual allegations by clear and convincing evidence. *Id.* Moreover, that court referenced the clear and convincing standard only once in its opinion. The district court acknowledged that the state court properly announced the *Strickland* standard and that, when taken in context, it was clear that the claim of prejudice was adjudicated pursuant to the appropriate legal rules provided by the Supreme Court. *Id.* at *14. It therefore rejected that petitioner's argument that the state court decision was contrary to clearly established federal law.

This conclusion is not merited here. First, the Tennessee Supreme Court never announced that the clear and convincing standard applied only to factual determinations, nor did it cite to any authority suggesting as much. Instead, it pronounced that this standard applied to Petitioner's constitutional claim in its entirety. To the extent it intended the clear and convincing standard to apply only to factual allegations, it did not write as much, nor did it clarify at any point in its opinion. Instead, it continued to refer to Petitioner's failure to prove his *Strickland* claim by clear

and convincing evidence. This Court must examine the Tennessee Supreme Court's written opinion, and it reflects that the state court applied a clear and convincing standard, which would be contrary to clearly established federal law.

### ii. Unreasonable Application of Clearly Established Federal Law

The Court also concludes that the Tennessee Supreme Court's decision was an unreasonable application of clearly established federal law. "A lesser-included-offense instruction is required only where 'the facts of the case and the laws of the State warrant such an instruction.'" *Smith v. Bradshaw*, 591 F.3d 517, 527 (6th Cir. 2010). Under Tennessee law, a trial court must instruct "as to all lesser-included offenses that are requested by a party in writing if the trial court determines that: (1) the record contains any evidence that reasonable minds could accept as to the existence of the lesser-included offense; and (2) the conviction for the lesser-included offense is supported by legally sufficient evidence."[2] *Bryant*, 460 S.W.3d at 523 (citing Tenn. Code Ann. § 40-18-110(a) (2012); *Burns*, 6 S.W.3d at 469)). When deciding whether an instruction is warranted, a trial court must view the evidence "liberally in the light most favorable to the existence of the lesser-included offense without making any judgment on the credibility of the evidence." *Id.*

A defendant is guilty of facilitation of a felony if "knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a)(2008). Section 39-11-402(2) provides that a person is guilty under a theory of criminal responsibility if "[a]cting with intent to promote or assist the commission of the

---

[2] There is no dispute that facilitation is a lesser-included offense of the crimes of sale and delivery of a controlled substance—the charged crimes in Petitioner's case. *Bryant*, 460 S.W.3d at 524.

offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense."

Here, the Tennessee Supreme Court concluded that there was "no evidence in the record from which a reasonable jury could conclude that Defendant merely facilitated the drug sales." *Bryant*, 460 S.W.3d at 525. Thus, the state court found that there was no evidence, and thus implicitly decided that there was insufficient evidence (as required by the second prong of the *Burns* test) to support a conviction of facilitation.

Under AEDPA, a district court analyzes a sufficiency of the evidence through a two step process. First, the Court must "determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of the crime beyond a reasonable doubt." *See Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)). Second, even if a rational trier of fact could have found Petitioner guilty of facilitation, a federal court must still defer to the state court's sufficiency determination as long as it is not unreasonable. *See id.* (citing 28 U.S.C. § 2254(d)(2)). Again, the question is not whether this Court agrees with the Tennessee Supreme Court's decision, but whether that decision is unreasonable.

Accordingly, the Court must decide whether the Tennessee Supreme Court's deficiency determination was unreasonable, by examining whether: (1) there was no evidence to support a facilitation instruction, and (2) counsel's decision was strategic.

### A. There was sufficient evidence to support a facilitation instruction

Having carefully considered the record, and the Tennessee Supreme Court's decision, this Court concludes that the state court's decision that there was no evidence, or even insufficient

evidence, to support a facilitation instruction, was unreasonable. The Tennessee Supreme Court

rejected Petitioner's argument that sufficient evidence supported a facilitation instruction:

> We agree and hold that, given the evidence presented at trial, reasonable minds could not have accepted the existence of facilitation, and a conviction for facilitation would not have been supported by legally sufficient evidence. See Tenn.Code Ann. 40–18–110(a).
>
> There is no evidence in the record from which a reasonable jury could conclude that Defendant merely facilitated the drug sales. The State's theory of the case, which was supported by the weight of the evidence, was that Defendant sold drugs to Mr. Knowles. Trial counsel's theory was that Defendant was entrapped by the State, through Mr. Knowles, into selling the drugs. The bulk of trial counsel's proof was that Defendant would not have sold Mr. Knowles the drugs had Mr. Knowles not approached him. Thus, trial counsel set up an all-or-nothing scenario in which Defendant either sold the drugs willingly or was entrapped. The uncontroverted evidence shows that Defendant set the price for the drugs, acquired the drugs, accepted payment for the drugs, and delivered the drugs to Mr. Knowles. The evidence supports the post-conviction court's finding that Defendant did not merely furnish substantial assistance in the drug sale, but instead, was the seller of the drugs.
>
> Accordingly, because there was no evidentiary basis to support a facilitation conviction, trial counsel's failure to request the instruction was not deficient performance.

*Bryant*, 460 S.W.3d at 525 (footnote omitted).

In analyzing this issue, the Tennessee Supreme Court's decision focused only on how the

evidence supported the conviction on the sale and delivery charges. It did not discuss any other

evidence in the record and explain why it could not support a facilitation instruction. Simply

because the evidence supported the conviction for the charged offense does not mean that there

was no evidence, or insufficient evidence, to support a facilitation instruction. There can be

evidence sufficient to support a conviction on both a greater and lesser included evidence. The

issue is, regardless of the evidence to support the sale and delivery charges, whether sufficient

evidence supported a facilitation instruction. The Court concludes that there was.

The record contains evidence that, if accepted by the jury, could support a facilitation conviction because the evidence would permit a jury to find each element of the facilitation instruction. This evidence included: (1) as it relates to intent, Petitioner testified he "helped [Knowles] – get his drugs" because Knowles continued to beg Petitioner to help him get money for his family, (Doc. 12-7 at 53); (2) Petitioner knew that the unidentified[3] drug dealer intended to commit a felony—sale or delivery of a controlled substance; (3) each transaction occurred at the behest of Knowles, also relevant to intent; (4) each transaction was completed only when a third party arrived with the drugs; (5) Petitioner transferred the money from Knowles to the drug dealer at each transaction, in full view of Knowles; (6) Petitioner returned ten dollars in change to Knowles at the second transaction (and in fact, there was no evidence that Petitioner benefitted monetarily at all because none of the buy money was found on Petitioner or at Petitioner's place following arrest); and (7) no pills were discovered on Petitioner or in his possession (including his home) after his arrest.

Petitioner's testimony also supports a facilitation instruction, including permitting the jury to infer his intent was only to facilitate, not promote the transaction. Petitioner himself characterized his role in the transactions as "help[ing] Knowles" to "get his drugs." (*Id.* at 53). When describing the second transaction, he indicated he did not have the pills on him, and that someone else "brought them to [him] and [Petitioner] gave them to . . . Knowles." (*Id.* at 56.) Petitioner testified that Knowles would continue to call him asking for pills and eventually Petitioner would "just go ahead and call the individual."[4] (*Id.* at 58.) Petitioner confirmed he

---

[3] The fact that the drug dealer was unidentified is irrelevant. Facilitation does not require proof of identity of the person intending to commit the felony. Here, the record demonstrates that person existed, because that person brought the drugs to each buy.

[4] At trial, Petitioner refused to name the individual who brought him the pills because he was concerned for his safety. (*Id.* at 79.)

never told Knowles to just come over and get the pills, (*id.*), from which a jury could infer Petitioner never had the pills—he had to arrange for someone else to bring them.

Following the close of the evidence, counsel and the court discussed whether to include an attempt instruction. During this discussion, trial counsel asked for the instruction, arguing "[m]aybe on the last two, an attempt. Because he's really not—I mean, it's really like just an exchange or something." (*Id.* at 85.) Trial counsel then abandoned the request for attempt and did not request the facilitation instruction. (*Id.* at 86.) But counsel's argument suggests, as does her closing argument, that Petitioner's participated was limited in that he only facilitated the transaction.

While the state court concluded that a facilitation instruction would not be consistent with the defense's theory of entrapment, that is not dispositive for two reasons. First, the defenses are not necessarily inconsistent—there is no reason defense counsel could not have argued that Knowles had entrapped Petitioner to facilitate the transactions. *See Bryant*, 460 S.W.3d at 534 (Wade, J., dissenting). Second, whether a facilitation instruction should have been given is determined by the evidence adduced at trial—not defense counsel's theory. *See State v. Allen*, 69 S.W.3d 181-187-88 (Tenn. 2002) (noting that "[t]he trial court must provide an instruction on a lesser-included offense supported by the evidence even if such instruction is not consistent with the theory of the State or of the defense. The evidence, not the theories of the parties, controls whether an instruction is required").

The facts and testimony above would satisfy each element of the facilitation offense. The above facts would permit a reasonable juror to conclude that Petitioner merely served as an intermediary between the unidentified dealer and Knowles in the sale of a controlled substance without intent to promote or benefit from the offenses—simply to help Knowles feed his family.

Contrary to the state courts' decisions, the evidence does not mandate the conclusion that Petitioner intended to promote or assist in the transaction—there are facts that he simply intended to facilitate the transaction to assist Knowles. Thus, the instruction should have been given.

This conclusion is supported by the Tennessee Court of Criminal Appeals's decision in a factually similar case, *State v. Jackson*, No. M2011-01077-CCA-R3-CD, 2012 WL 5873506, *1 (Tenn. Crim. App. Nov. 21, 2012). In that case, the defendant was convicted of both selling and delivering cocaine within a drug-free school zone. *Id.* The conviction was based on a single drug buy, orchestrated by a confidential informant. *Id.* The defendant was arrested at the buy, after the transaction had concluded. *Id.*

However, at the trial, the defendant testified that the confidential informant approached him and offered him $50 to accompany him to the gas station where the confidential informant was going to sell drugs to "two white guys." *Id.* at *2. The defendant was unemployed and his wife was in the hospital, so he agreed to go with the confidential informant. *Id.* When the officer arrived, the confidential informant was putting oil in the car, so the defendant walked to the officer and, after confirming the officer's identity, the defendant said that the confidential informant instructed him to take the cocaine to the buyer and then go into the gas station and buy beer and cigarettes. *Id.* The defendant was thereafter arrested. *Id.*

The trial court had refused a request for the facilitation instruction, stating there was "no evidence whatsoever that this other person was involved in a crime." *Id.* at *6. The appellate court disagreed, finding that the proof supported an instruction on facilitation. *Id.*

The facts in *State v. Jackson* are not materially distinguishable from this case. In both cases, the defendants testified they were engaged by the confidential informant to assist in a drug deal and both engaged in conduct that arguably constitutes facilitation, rather than the greater

offense. While other evidence supported the conviction of the greater offense, that does not eliminate the evidence that also supported an instruction on facilitation. Accordingly, there was sufficient evidence to support a facilitation instruction.

In this case, the Tennessee Supreme Court's decision was not simply incorrect—it was unreasonable. State law governs whether a facilitation is necessary, and if it is, and counsel failed to request it, such a decision is deficient. Tennessee law requires that the jury be instructed on a lesser included offense when any evidence supports the instruction and sufficient evidence would support a conviction. Federal law is clear that sufficient evidence exists if any rational trier of fact could have found the party guilty of the crime beyond a reasonable doubt. Here, as demonstrated above, there was at least some evidence to support each element of facilitation. The Tennessee Supreme Court's decision that no evidence could support a finding of facilitation is, in light of the above discussion, simply unreasonable. Unless counsel's failure to request the instruction was strategic, counsel's performance was deficient.

### B. The failure to request a facilitation instruction was not a strategic decision

The Tennessee Supreme Court also concluded that trial counsel was not deficient for failing to request a facilitation instruction because it was a purposeful and strategic decision. *Bryant*, 460 S.W.3d at 526. The court stated:

> Trial counsel portrayed Defendant as an upstanding citizen, and had trial counsel argued that defendant was merely assisting the drug supplier, the strategy and theory of the case would have been undermined. Trial counsel's argument exhibited a strategic decision to focus on either outright acquittal or conviction of misdemeanor offenses, as opposed to the serious felony charges Defendant was also facing. While a lesser-included offense instruction could have been requested by trial counsel, regardless of her strategy, the record supports the conclusion that she made a strategic choice not to make this request.

*Id.*

The Tennessee Supreme Court continued:

Thus, we agree with the Court of Criminal Appeals' determination that a facilitation instruction would have been incompatible with trial counsel's strategy, and the failure to request such an instruction was not an oversight. At the post-conviction hearing, trial counsel exercised the type of "20–20 hindsight" that appellate courts must avoid when evaluating trial counsel's performance. That trial counsel now, with the benefit of time and reflection, believes that requesting a facilitation instruction would have been advantageous is not persuasive. Accordingly, Defendant has failed to prove by clear and convincing evidence that trial counsel's failure to request the lesser-included offense instruction of facilitation was deficient performance.

*Id.* (internal citations omitted).

Trial counsel testified at the hearing on Petitioner's post-conviction motion. (Doc. 12-18.) During this hearing, counsel testified that she had been practicing law for around two years and that this was not her first jury trial. (*Id.* at 3, 8.) When asked why she did not request a facilitation instruction, counsel responded

"I don't -- I don't know why I didn't ask for facilitation. I don't know. I don't know why I didn't ask. Thinking back, I'm sure I should have. I don't know if I was real familiar with facilitation at that time. I don't know why I didn't ask for facilitation. I was sort of new to the law –
…
I don't -- I don't know at that time if I had ever tried a school zone case or something of that magnitude I'm not sure of that time. Just some of the charges, the lesser includes and all were sort of, unfamiliar to me, you know, back then. Also around that time I remember the case had been continued because I had surgery. I don't know if -- I don't know why I didn't ask, I don't know.

(*Id*. at 5-6.)

When asked on re-direct whether "it [was] strategy on [her] part to fail to request a facilitation instruction," she responded "[n]o, it was no strategy." (*Id.* at 11.) She admitted she never discussed a facilitation instruction with her co-counsel on the case, nor had she researched it prior to trial. (*Id.* at 12-13.) When asked whether her failure to request the facilitation instruction was because of her inexperience, she said "I would say so." (*Id.* at 13.)

The United States Supreme Court has cautioned that "courts may not indulge in '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's

actions." *Harrington v. Richter*, 562 U.S. 86, 109 (2011) (citing *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003)). Moreover, "[s]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91.

Here, counsel testified that she was relatively new to the practice of law. She did not research or discuss or otherwise consider the inclusion of the lesser-included-offense of facilitation prior to trial. She could not recall why she did not ask for the facilitation instruction, although her other testimony suggests it was because she was unaware that facilitation might apply. When asked if she chose not to request the facilitation instruction because of strategy, she specifically answer "no." Instead, she said that her failure was caused by her inexperience.

In light of this unrefuted testimony, the state court's conclusion to the contrary is an impermissible "*post hoc* rationalization" of counsel's failure. *See Harrington*, 562 U.S. at 109; *Wiggins*, 539 U.S. at 526-27. The Tennessee Supreme Court concluded that counsel's testimony was impermissible "20-20 hindsight," but counsel did not frame her testimony from the perspective of what she should have done. She testified as to the motivations for her actions at the time. Although she could not recall exactly why she did not request the instruction, she was clear that it was not part of her strategy.

Indeed, trial counsel testified that she had not researched or otherwise discussed a facilitation instruction prior to trial. Thus, because she entirely failed to consider the instruction prior to trial, it could not be deliberate strategy not to request the instruction. The law is clear that a failure to investigate or research is reasonable only to the extent such a limitation is supported by professional judgment. *Strickland*, 466 U.S. at 690-91. The facts of the case clearly implicate

a facilitation charge, and so counsel's decision not to consider this in any fashion cannot be considered reasonable, and thus it is not strategic.

The Tennessee court ignored this unrebutted testimony and instead, simply reviewed the evidence and concluded that counsel's actions must have been purposeful and strategic. But, in light of her post-conviction hearing testimony, any such conclusion is unreasonable. That is not to say that, if she had testified she had strategically decided not to ask for a facilitation instruction, such a decision would not have been supportable as strategy, as the Tennessee state courts' opinions reflect. It probably would have been. But that is not the testimony in this case, and this Court cannot simply ignore this unrefuted post-conviction hearing testimony.

Respondent argues that the Tennessee Supreme Court made a finding of fact regarding trial counsel's credibility, and that this finding is entitled to deference under section 2254(e). Having reviewed the Tennessee Supreme Court's opinion, this Court disagrees. The state court noted that the trial court did not accredit or discredit trial counsel's testimony during the post-conviction hearing. Instead, the court merely recited the facts that *would have* supported trial counsel's decision not to request a facilitation instruction and concluded that her testimony during the post-conviction hearing was impermissible "20-20 hindsight." Thus, it is not entitled to the presumption of correctness under section 2254(e)(1).

Even if it were entitled to a presumption of correctness, this presumption has been rebutted by clear and convincing evidence. As set forth above, counsel's unequivocal testimony during the post-conviction hearing was that her decision not to request a facilitation instruction was not one of strategy. This is clear and convincing evidence overcoming any finding to the contrary. As discussed above, the state court's attempt to replace this testimony with its own finding that the opposite, in fact, was true, is nothing more than an impermissible *post hoc* rationalization.

For these reasons, counsel's decision not to request a facilitation instruction was not strategy and instead was deficient.

### b. Prejudice

#### i. Contrary to

Petitioner alleges that the Tennessee Supreme Court also announced and applied the wrong standard to its analysis of the prejudice prong of the *Strickland* test. The Tennessee Supreme Court stated that a petitioner proves prejudice "when the proof supports a finding of a lesser-included offense and a reasonable probability exists that a reasonable juror **could have** convicted the defendant of the lesser-included offense had it received such an instruction." *Bryant*, 460 S.W.3d at 527 (emphasis added). That is not the *Strickland* standard.

*Strickland* requires a petitioner to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding *would have* been different." *Strickland*, 466 U.S. at 694 (emphasis added). The Tennessee Supreme Court acknowledged this standard in a later opinion, and further noted that the standard announced in *Bryant* was different than this standard and incorrect. *See Moore v. State*, 485 S.W.3d 411, 421 n.3 (Tenn. 2016).

The United States Supreme Court has acknowledged that "[a] state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases," and it similarly recognized that a state court decision that applies a "preponderance of the evidence" standard to the prejudice prong of an ineffective assistance of counsel claim would be "contrary to" clearly established federal law because *Strickland* clearly establishes that a prisoner "need only demonstrate a 'reasonable probability that . . . the result of the proceeding would have been different.'" *Williams*, 529 U.S. at 405 (quoting *Strickland*, 466 U.S. at 694).

The Tennessee Supreme Court's decision, by reciting and applying the wrong standard, is contrary to clearly established law. There can be no dispute that the court announced the wrong standard by using the words "could have," rather than "would have," when referring to the actions of a reasonable jury, as the court later acknowledged. *See Moore*, 485 S.W.3d at 421 n.3. Respondent appears to concede that the Tennessee Supreme Court stated the wrong standard in its opinion, as he argues only that this Court need not reach the prejudice prong because Petitioner has failed to prove deficient performance. (Doc. 42 at 12.) But for the reasons stated above, this Court concludes that counsel's performance was deficient.

Because the Tennessee Supreme Court's decision as to prejudice announced and applied the wrong standard, it was contrary to clearly established federal law. It is recommended that the writ issue as to this claim.

### ii.     Unreasonable Application of Clearly Established Federal Law

In this case, the character of the evidence in the record shows there is a reasonable probability that a properly instructed jury would have convicted Petitioner of facilitation, rather than selling or delivering the drugs. Here, a jury initially could not reach a decision as to Petitioner's guilt—they hung during his first trial. In his second trial, the prosecution's main witness, the confidential informant, did not testify live. Additionally, the jury acquitted Petitioner as to one charge. In light of that fact, and the evidence already identified from which a reasonable juror could conclude that Petitioner was guilty of no more than facilitation, there is a reasonable probability that a properly instructed jury would have found Petitioner guilty of facilitation rather than delivery or sale.

### 2. Failure to adequately respond to the admission of Knowles' prior testimony

Petitioner argues that trial counsel was ineffective for failing to adequately object to the admission of Mr. Knowles' prior testimony; failing to request the dismissal of all charges based on Mr. Knowles' absence; and failing to request a continuance to allow additional time to secure Mr. Knowles' presence. Petitioner also argues that trial counsel was ineffective for failing to effectively cross-examine Knowles at the first trial with all available impeachment evidence. Respondent contends that these ineffective assistance of counsel claims are untimely and procedurally defaulted.

### a. Statute of Limitations

There is no dispute that, following the conclusion of direct review, a petitioner generally has one year to file a petition for writ of habeas corpus. 28 U.S.C. § 2244(d)(1)(A). Petitioner raised this claim in his amended petition, which was filed on November 16, 2016. Petitioner does not dispute that this is more than one year after the conclusion of his direct review in state court. Petitioner argues that his claims are subject to federal review because the statute has been tolled either under section 2244(d)(2) or under the doctrine of equitable tolling. Neither argument has merit.

First, section 2244(d)(2) only tolls "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." Here, Petitioner does not expressly identify the basis for the alleged application of this provision, but based on his other arguments, the Court presumes that he is arguing that his motion for appointment of counsel somehow tolled the statute of limitations. However, Petitioner's motion to have counsel appointed was filed in federal, not the state court. Neither is the motion one for state post-conviction or other collateral review. Thus, section 2244(d)(2) does not apply.

Petitioner next contends that his motion for appointment of counsel implicates the doctrine of equitable tolling, relying on Title VII cases that permit equitable tolling during the pendency of a motion for counsel. The Supreme Court has concluded that the doctrine of equitable tolling may be applied in habeas cases. *Holland v. Florida*, 560 U.S. 631, 649 (2010). A petitioner may be "'entitled to equitable tolling' only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Id.* (citing *Pace v. DiGuglielmo,* 544 U.S. 408, 418 (2005)). "The Sixth Circuit has long held that 'ignorance of the law alone is not sufficient to warrant equitable tolling,'" *Cole v. Phillips*, No. 117CV01105JDBEGB, 2018 WL 1053546, at *4 (W.D. Tenn. Feb. 26, 2018) (citing *Griffin v. Rogers*, 399 F.3d 626, 637 (6th Cir. 2005) (quoting *Rose v. Dole*, 945 F.2d 1331, 1335 (6th Cir. 1991)).

Petitioner does not enunciate his theory as to why equitable tolling should be applied to his situation. However, he appears to contend that he needed counsel to adequately argue the merits of his habeas claim, and so the statute of limitations should be tolled during the period which his request for counsel was pending. But such a theory has been rejected by the Sixth Circuit, which has held that ignorance of the law is generally insufficient to warrant equitable tolling. *See Griffin*, 399 F.3d at 637. Moreover, Petitioner relies only on Title VII authority, and he does not cite a single case which permits equitable tolling during the pendency of a request for counsel in a habeas case. And at least one court has rejected such an argument when considering the timeliness of a habeas petition brought pursuant to Section 2255. *See Csanadi v. United States*, No. 3:15CV1459 (JBA), 2016 WL 2588162, at *6 (D. Conn. May 4, 2016). In that case, the District Court for the District of Connecticut refused to apply Title VII equitable tolling cases to the habeas context, concluding that "[s]uch a system would undermine AEDPA's statute of limitations and essentially

eliminate the requirement that prisoners demonstrate 'extraordinary' circumstances in order to obtain equitable tolling." *Id.* The Court finds this reasoning persuasive. Thus, Petitioner has not carried his burden to show that equitable tolling should be applied in his case. As such, this claim is barred by the statute of limitations and should not be considered on the merits.

### b.    Procedural Default

Even if the Court were to apply equitable tolling, the claims would be procedurally defaulted, barring review on the merits. In order for this Court to review the merits of a habeas claim, Petitioner must have presented the claim to the state courts, and they must have had a full and fair opportunity to adjudicate it. "When a petitioner fails to obtain consideration of a claim by a state court . . . due to the petitioner's failure to raise that claim before the state courts while state-court remedies are still available. . . , that claim is procedurally defaulted and may not be considered by the federal court on habeas review." *Seymour v. Walker*, 224 F.3d 542, 549-50 (6th Cir. 2000). A petitioner can avoid this procedural default only if he can show cause for the default and prejudice that would result from the default. *Id.* at 550.

Petitioner does not dispute that these ineffective assistance of counsel claims are procedurally defaulted, but he argues that he can overcome this procedural default under *Martinez v. Ryan*, 566 U.S. 1 (2012). In *Martinez*, the Supreme Court held that a petitioner may be able to establish cause to overcome procedural default on ineffective assistance of counsel claims when such claims must be brought in initial-review collateral proceedings if he can establish ineffective assistance of counsel during such collateral proceedings. *Martinez*, 566 U.S. at 9. So, to establish "cause" under *Martinez*, a petitioner must establish (1) a substantial ineffectiveness claim, and (2) that under *Strickland v. Washington*, post-conviction counsel was ineffective for failing to present

the claim, or that he had no counsel at all during that proceeding. *Id.* at 14. In order to be "substantial," the claim must have some merit. *Id.*

Having considered the arguments of the parties, and for the reasons discussed below, the Court concludes that Petitioner has failed to show that he can satisfy the *Martinez* requirements to overcome the procedural default because he cannot show that the underlying ineffective assistance of counsel claims are substantial. They simply do not have any merit.

### i. Failure to adequately object to the admission of Mr. Knowles' prior testimony, request a dismissal of all charges based on Mr. Knowles' absence, and request a continuance

Petitioner argues that trial counsel was ineffective for failing to adequately object to the admission of Mr. Knowles' prior testimony; failing to request the dismissal of all charges based on Mr. Knowles' absence; and failing to request a continuance to allow additional time to secure Mr. Knowles' presence. But Petitioner fails to establish that any of these claims are substantial.

First, Petitioner does not explain how trial counsel failed to adequately object to the admission of Knowles's testimony. Indeed, review of the record demonstrates that counsel strenuously objected to the introduction of Knowles's testimony. Counsel filed a written objection to the prosecution's motion that Knowles be declared unavailable. (*See* Doc. 12-1 at 84-89.) Then, counsel zealously argued against Knowles being declared unavailable and his prior testimony being admitted during the hearing on the motion. (*See* Doc. 12-4 at 13-68.) To the extent Petitioner believes other arguments should have been made, he does not explain what those arguments are. Even if he did, asking this Court to second-guess his attorney's tactical and/or strategic decisions as to the arguments she proffered to the state court ventures into second-guessing that federal courts are prohibited from doing. Thus, this claim lacks merit.

Petitioner's arguments regarding counsel's failure to move to dismiss the charges or to request a continuance fail for the same reason—such decisions were tactical and/or strategic and thus not deficient. First, with regard to counsel's decision not to request a continuance, she noted in her argument that Petitioner was being held in custody and it was unclear whether Knowles would be found. (Doc. 12-4 at 67). It is likely that counsel believed the prosecution's case was much weaker without Knowles's testimony, which it would have been, and so she made a strategic decision to ask the trial judge to deny the prosecution's motion to declare Knowles unavailable and move forward with the trial, thus giving her client a strategic advantage. Such a decision is one of strategy, and this Court is prohibited from second-guessing it on habeas review.

Next, even if counsel's decision not to move to dismiss the charges was deficient, Petitioner cannot prove prejudice because he cannot show that the trial judge would have granted such a motion, thus changing the outcome of the proceeding. Here, the trial judge ultimately concluded that Knowles was unavailable and admitted his prior testimony. In light of this finding of unavailability, the judge would have certainly denied any request by trial counsel to dismiss the charges against Petitioner. Thus, Petitioner cannot establish prejudice.

ii. **Failure to effectively cross-examine Knowles at the first trial with all available impeachment evidence**

Petitioner contends that trial counsel was deficient for failing to exploit certain impeachment evidence against Knowles, including that he apparently became a confidential informant with the hope of obtaining a dismissal or favorable resolution to a felony charge; he received money for each drug transaction he conducted; and by the time the trial occurred, he had a warrant against him for a probation violation and was actually in custody. Petitioner concedes that some of these facts were elicited on the state's direct examination of Knowles, but contends that counsel should have cross-examined Knowles on these additional facts.

Here, Petitioner asks this Court to engage in the type of behavior *Strickland* specifically forbids the Court to do: engage in 20/20 hindsight review. Petitioner has identified certain facts that he argues were paramount to showing Knowles's bias and untrustworthiness. But this is nothing more than a dispute about strategy. Counsel emphasized certain facts, while Petitioner believed others were more important. Petitioner's disagreement with counsel's strategy does not render trial counsel's performance deficient. *Strickland*, 466 U.S. at 689.

Furthermore, even if counsel's performance was deficient, Petitioner has suffered no prejudice because the jury was made aware of this information and thus could consider it in making a credibility determination as to Knowles's testimony. Specifically, Detective Loucks testified that it was not uncommon for confidential informants to begin their career as such to "help themselves out with their [criminal] charges," and that Knowles specifically began working as a confidential informant after he was arrested and charged with being a habitual motor offender, a charge which, Detective Loucks admitted during his testimony, was dismissed at his request. (Doc. 12-4 at 88, 90; Doc. 12-5 at 23.) Additionally, Detective Loucks testified that he paid Knowles for each drug transaction and also $800 in relocation costs. (Doc. 12-5 at 14-15; 22-23; 25.) Because the jury was aware of this information, Petitioner cannot show that a reasonable probability exists that the proceeding would have been different if only trial counsel's cross-examination had been more thorough.

### 3. Failure to object to the trial court's instruction defining "school zone"

Petitioner argues that trial counsel was ineffective for failing to object to the trial court's instruction regarding the "school zone" enhancement. The trial court's instruction to the jury was that, to find Petitioner guilty, the jury must find "that the sale [delivery] occurred within 1,000 feet of a school zone." (Doc. 12-2 at 7, 9.) But, the instruction did not define that a school zone is an

area "within one thousand feet (1,000) of the real property that comprises a public or private elementary school, middle school, secondary school, preschool, child care agency, or public library, recreational center or park."  Tenn. Code. Ann. § 39-17-417(b).

Respondent contends that this claim is barred by the statute of limitations and that it is procedurally defaulted.

### a.    Statute of Limitations

Petitioner contends that the statute of limitations should be equitably tolled for this claim. For the reasons set forth above in Section A.2.a., that argument is not well-taken.  Thus, this claim is barred by the statute of limitations and should not be considered on the merits.

### b.    Procedural Default

Even if the Court concluded that this claim was not barred by the statute of limitations, this Court is still precluded from reviewing the merits of this claim because it is procedurally defaulted. Petitioner even concedes that this claim is procedurally defaulted.  Petitioner contends that he can overcome this default through the *Martinez* exception.  He argues that trial counsel performed deficiently by failing to object to the jury instruction on the school zone enhancement, because the instruction was incomplete.  He does not, however, articulate an argument as to how this failure to object was prejudicial.  Instead, he requests an evidentiary hearing during which he will prove the alleged prejudice.

To determine whether an evidentiary hearing is appropriate in a habeas case, the Court must consider whether: (1) an evidentiary hearing is necessary under Rule 8 of the Rules Governing Section 2254 Proceedings in United States District Courts and (2) a hearing is permitted under 28 U.S.C. § 2254(e)(2).  The Supreme Court has explained that when analyzing whether an evidentiary hearing is appropriate, a court should consider whether a hearing "could enable an

applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to . . . relief. . . . [I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Schriro v. Landrigan,* 550 U.S. 465, 474 (2007) (citations and footnote omitted).

An evidentiary hearing is not required here because in this situation, a hearing would not enable Petitioner to prove his factual allegations. Assuming that counsel was deficient for failing to object to the purportedly incomplete jury instructions, Petitioner would still need to prove that this failure prejudiced him—that but for counsel's error, the outcome of the proceeding would have been different. So, under these circumstances, Petitioner would need to show that if a proper jury instruction would have been given, one that included the definition of a school zone, the jury would not have found him guilty on the school zone enhancement. The record belies any such showing.

First, during direct examination, the prosecution elicited testimony from its witness about the 1,000 foot "buffer" around the area schools and that this buffer was legally important. (Doc. 12-6 at 88-89; 91-92.) The prosecution then guided the witness through each transaction and the witness testified that each transaction fell within the identified buffer. (*Id.* at 85-88, 91-92; Doc. 12-9 Exs. 12a-b.) Petitioner offered no affirmative testimony that the transactions did not occur within 1000 feet of a school. So, if the jury would have been instructed as to the definition of a school zone, it could reasonably have accepted this testimony as true and this testimony supported the conviction on the enhancement. Thus, Petitioner cannot show that counsel's failure to object to the school zone enhancement instruction was prejudicial.

**B. Declaring Knowles unavailable and allowing his prior testimony to be read into the record violated the Confrontation Clause**

The Sixth Amendment provides that "the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Thus, testimony cannot be admitted if "a witness . . . did not appear at trial unless he [is] unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 54 (2004). So, the prosecution cannot substitute a witness's former testimony in place of live testimony without first demonstrating that (1) the prosecution made a good-faith, but unsuccessful, effort to obtain the witness's testimony at trial; and (2) the defendant had an adequate opportunity to cross-examine the witness at a prior proceeding. *Ohio v. Roberts*, 448 U.S. 56, 65 (1980), *overruled on other grounds by Crawford*, 541 U.S. 36. Petitioner contends that neither of these provisions were satisfied, and so the trial court's admission of Knowles's prior testimony violated the Confrontation Clause.

**1. Good-Faith Effort**

The prosecution has the burden of proving that it made a good faith effort to secure a witness's presence at trial. *Roberts*, 448 U.S. at 74-75. Whether the prosecution's efforts were sufficient to constitute a good faith effort is a "question of reasonableness." *Id*. at 74. The law does not require futility, and so if a witness's presence is not possible, nothing needs to be done. *Id.* However, if there is some possibility, effort is required—the amount of which is determined by a reasonableness inquiry. *Id.*

The Tennessee Criminal Court of Appeals addressed this issue in Petitioner's direct appeal, and it concluded that the prosecution had made a good faith effort to secure Knowles's presence at the trial. *State v. Bryan*, No. M2009-01718-CCA-R3-CD, 2010 WL 4324287, *19 (Tenn. Crim.

App. Nov. 1, 2010). In its opinion, the state court recognized the standard announced by the

*Roberts* court and carefully considered the record. *Id.* at *15-19. It stated:

> As thoroughly detailed above, after the conclusion of the first trial, Knowles'
> attorney stressed to Knowles the importance of his cooperation with the State and
> that he be available to testify at the rescheduled trial. Knowles assured her that he
> would. The district attorney contacted Knowles' attorney within the two weeks prior
> to the trial inquiring into Knowles' whereabouts. Detective Loucks was in contact
> with Knowles in November 2008, before the original retrial date in December 2008.
> Detective Loucks reminded Knowles of the upcoming trial date and of his
> importance of attending even if he did not receive a subpoena. Detective Loucks
> ultimately did not attempt to locate Knowles before the December 2008 trial setting
> because the date was cancelled. However, several times in the week prior to the
> February 2009 trial setting, Detective Loucks visited a number of the previous
> addresses he had for Knowles and made numerous phone calls in an attempt to
> locate him. At one of the addresses, Knowles had an active utility account and it
> was supposed to be his mother's address, however, no one answered the door. It
> was based on these actions that the trial court found that the State had made a good
> faith effort to find Knowles.

> The actions taken and the proof presented in this case are in contrast to the minimal
> actions taken in *State v. Armes,* 607 S.W.2d 234 (Tenn.1980) and *State v. Charles
> Sharp,* No. W2008–01656–CCA–R3–CD, 2010 WL 623589 (Tenn.Crim.App.
> Feb.22, 2010). In *Armes,* the court observed that "the prosecutor's *de minimis* effort
> of issuing a subpoena for [the witness] the day before the trial can only be seen as
> less than a good faith effort." *Armes,* 607 S.W.2d at 237. The court further observed
> that the prosecutor's representations to the court "concerning the efforts of the
> State's investigator to locate the witness cannot be considered as evidence of proof
> on the issue of the State's good faith effort." *Id.*

> In *Charles Sharp,* this court noted that the State had attempted to serve a subpoena
> on a witness who had moved out of state and also attempted to call the witness at a
> number that was eventually disconnected. *Charles Sharp,* 2010 WL 623589, at *6.
> The court determined that the State "should have realized early on that placing
> telephone calls in and of itself would not be sufficient to contact the witness in
> question" after six to eight months of being unable to locate her. *Id.* Noting the
> similarity to Armes, this court observed that the State had not presented any
> independent evidence of its efforts to locate the witness. *Id.* Specifically, this court
> said that other than proffering the subpoena and the district attorney's
> representations, "[t]he State failed to present any other witnesses to demonstrate
> the efforts extended to locate the witness." *Id.*

> The proof in this case is more in line with that in *State v. Summers,* 159 S.W.3d 586
> (Tenn.Crim.App.2004), a case in which the trial court deemed unavailable a witness
> who appeared for the first day of trial and then did not return. This court stated:

Although the record does not resolve the question whether [the witness] was ever actually served with a subpoena, it is clear that [the witness] was aware of the proceedings and that the state sought to introduce his testimony. Moreover, it is undisputed that he intentionally absented himself from the proceedings and took steps to keep the state from discovering his whereabouts. The state presented evidence of its agents' efforts to locate the witness. [The witness's] attorney counseled him about the importance of coming to court, but he persisted in his refusal to do so. These facts all support a finding that the state made good faith efforts to locate the witness but was unable to do so. Given these facts, the presence or absence of a subpoena appears irrelevant.

*Id.* at 597–98.

Upon review of the proof presented concerning the State's efforts to locate Knowles and in light of the relevant case law, we cannot conclude that the trial court abused its discretion in declaring Knowles unavailable and allowing his thoroughly cross-examined testimony from the first trial to be read to the jury.

*Id.* at *18-19.

The state court's conclusion is not an unreasonable application of the law. That court carefully reviewed the record in this matter, considered the prosecution's actions, and concluded that those actions were reasonable based on the circumstances. Although Petitioner makes much of the fact that Detective Loucks did not do more to maintain contact with Knowles given his prior failures to appear, the record is clear that Detective Loucks was unaware of this fact at that time. *Id.* at *16. Petitioner's argument, at its core, is that the prosecution should have done more, but that is insufficient for this Court to grant habeas relief. Even if the Court believed that more should have been done, its mere disagreement with the state court's solution is not sufficient to award habeas relief. *See Lewis*, 632 F. App'x at 795 (recognizing that even "if there is room for reasonable debate on the issue, the state court's decision to align itself with one side of the argument is necessarily beyond this court's power to remedy under § 2254, even if it turns out to be wrong"). Instead, the state court's decision must be unreasonable, and it was not.

While Petitioner compares this case to the prosecution's actions in *U.S. v. Tirado-Tirado*, 563 F.3d 117 (5th Cir. 2009), the Court finds that decision distinguishable. In that case, the witness was released by the prosecution with nothing more than a verbal instruction to return for trial when the prosecution knew that the witness would be deported to Mexico. *Id.* at 123. Then, the prosecution failed to even attempt to contact the witness, who remained in another country, until eight days before trial and even then, it sent only a letter. *Id.* at 124.

Here, Knowles was not out of the country, or even out of the state. At most, he may have been outside of the county. But Detective Loucks certainly expended more effort than the prosecution in *Tirado-Tirado*. Detective Loucks verbally informed Knowles of his need to be at the next trial, and prior to trial, he searched for Knowles by contacting his attorney, visiting his previous addresses, and calling his contact numbers. *See Bryant*, 2010 WL 4324287, at *15. Although Petitioner contends that the prosecution could have done more, that is not the standard. The standard is that the prosecution make a good faith effort to secure a witness—not that it make every effort. The trial court concluded these efforts were reasonable, and the Tennessee Criminal Court of Appeals affirmed. Having reviewed this matter independently, this Court cannot conclude that this decision was an unreasonable application of federal law.

Neither is Petitioner's "contrary to" argument well-taken. Petitioner contends that the appellate court improperly viewed the unavailability question through the lens of "abuse of discretion," which "substantially diluted" the prosecution's burden as established by *Roberts*. However, that is not the case. The appellate court correctly acknowledged the *Roberts* standard— in the sentences preceding its acknowledgement of the abuse of discretion standard of review. *See id.* at *17. It is clear from the opinion that the court properly recognized the prosecution's burden

to exercise good faith efforts to secure Knowles's presence at trial. Therefore, Petitioner's argument is without merit.

### 2. Cross-Examination

Petitioner also contends that his right to confrontation was violated because he did not have an adequate opportunity to cross-examine Knowles because significant impeachment evidence was not discovered until after the first trial. This evidence includes Knowles's receipt of $800 in relocation fees and the dismissal of Knowles's pending probation violation warrant. Respondent contends that this claim is procedurally defaulted because Petitioner did not argue on appeal that he did not have an adequate opportunity to cross examine Knowles.

### a. Procedural Default

Petitioner argues that he can overcome procedural default under *Martinez v. Ryan*, 566 U.S. 1 (2012). So the Court must analyze whether Petitioner has shown (1) a substantial ineffectiveness claim, and (2) that under *Strickland v. Washington*, post-conviction counsel was ineffective for failing to present the claim, or that he had no counsel at all during that proceeding. *Id.* at 14.

Petitioner argues that his counsel "performed deficiently by raising a Confrontation Clause challenge to the introduction of Knowles' prior testimony only on the ground that the State had not established Knowles' unavailability." (Doc. 45 at 6.) Petitioner argues that counsel should have also argued that the introduction of Knowles's testimony also violated the Confrontation Clause because he did not have the chance to adequately cross examine Knowles because new impeachment evidence came to light after the trial, specifically the fact that Knowles was paid $800 to relocate and that his probation violation warrant was dismissed. (*Id.*) Petitioner further contends that this is evidence that has been found to be "material" in the *Brady* context. (*Id.*)

Having considered the arguments of the parties, the Court concludes that Petitioner has failed to show that the *Martinez* rule applies here. First, *Martinez's* holding is narrow: "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez*, 566 U.S. at 9. *Martinez* does not provide a basis to excuse procedural default of any claim—only ineffective assistance of counsel claims. The underlying claim is not one for ineffective assistance of trial counsel—it is an alleged trial court error, because Petitioner contends the trial court improperly admitted Knowles's testimony.

Indeed, there was nothing for trial counsel to be deficient about: the alleged impeachment evidence did not develop until after the first trial. Thus, counsel could not have failed Petitioner during the first trial as to this evidence. This claim is procedurally defaulted.

### b.    Merits

Even if the Court were to consider the merits, the Court finds that Petitioner cannot establish prejudice. Importantly, the impeachment evidence identified by Petitioner was presented to the jury through the testimony of Detective Loucks. Detective Loucks testified that he paid Knowles $800 to relocate and that he attended Knowles's probation violation hearing and negotiated the dismissal of the warrant. (*See* Doc. 12-5 at 25, 49-50.) Defense counsel then emphasized the importance of this information during her examination of Detective Loucks:

> Q.    (By Ms. Kimbrough) In all, you've been paid -- you've paid Mr. Knowles, the confidential informant, almost two thousand dollars as related to this case.
>
> A.    Right about, yes.
>
> Q.    You've had a case dismissed against him.
>
> A.    Correct.

Q.      You were instrumental in two probation violations being retired or nollied?

A.      Two probation violations?

Q.      I'm sorry. You were instrumental in having a bond on one so that he could get out?

A.      Yes. I asked for a bond, yes, I did.

Q.      Okay. And then you were there on his probation violation day. You showed up then to assist?

A.      I was.

(*Id.* at 55.)

Thus, the jury was aware of the evidence Petitioner now argues was paramount to the cross examination of Knowles. Even if some deficiency can be attributed to trial counsel or even post-conviction counsel, there is no prejudice to Knowles because the jury was aware of this information.

**C.      The State introduced false testimony from Knowles in violation of Petitioner's right to due process**

Petitioner alleges that his due process rights were violated because the prosecution introduced false testimony of Knowles. Specifically, Petitioner contends that Knowles falsely testified that he was not promised anything more in exchange for his work on the case and his trial testimony. Petitioner points to the subsequent $800 paid to Knowles to relocate and the dismissal of his probation violation warrant—both of which occurred after Petitioner's first trial. Respondent argues that the claim is barred by the statute of limitations and procedurally defaulted, and so this Court should not consider the claim on its merits. However, even if it did, the claim should be denied.

### 1.    Statute of Limitations

Petitioner contends that the statute of limitations should be equitably tolled for this claim. For the reasons set forth above in Section A.2.a., that argument is not well-taken. Thus, this claim is barred by the statute of limitations and should not be considered on the merits.

### 2.    Procedural Default

Even if this Court accepted Petitioner's equitable tolling argument, Petitioner concedes that this claim is procedurally defaulted. He argues that he can overcome this default under the *Martinez* exception because, although this claim does not involve ineffective assistance of counsel, as Justice Scalia recognized in his dissent in that case, the same rationale could apply to other claims that cannot be raised until "initial-review collateral proceedings." *See Martinez*, 566 U.S. at 19 (Scalia, J., dissenting).

Petitioner's argument is not well-taken. The *Martinez* court expressly limited its exception to ineffective assistance of counsel. *See id.* at 9. The Sixth Circuit has recognized and enforced this limitation. *See Abdur'Rahman v. Carpenter*, 805 F.3d 710, 714 (6th Cir. 2015) (recognizing *Martinez's* limitation and refusing to expand it to claims of cumulative error involving *Brady* and prosecutorial misconduct claims). Because this is not an ineffective assistance of counsel claim, *Martinez* does not apply, and this claim is procedurally defaulted.

### 3.    Merits

Even if this Court were to consider the merits of the claim, it would fail. The Sixth Circuit has recognized that "[t]he knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998) (quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989)). To prove a denial of due process, a defendant

must show: (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew the statement was false. *Id.* Petitioner cannot satisfy this standard.

First, Petitioner cannot show that, at the time Knowles testified, the statements Petitioner identifies were, in fact, false. The record reflects that the $800 was paid to Knowles to assist him in relocating because he was concerned for his safety, and this concern did not arise until Petitioner's counsel approached Knowles *during trial*. Regardless, the $800 was not paid until after the conclusion of the trial, and thus after Knowles testified. So, Petitioner cannot show that Knowles's testimony was in fact false when the payment was not made until after trial and the circumstances giving rise to the payment did not occur until during the trial. The same is true regarding the dismissal of the warrant—that did not occur until after the trial, and thus after Knowles testified.

Second, for these same reasons, Petitioner cannot prove that the prosecution knew the testimony was false. Both the payment and the dismissal of the warrant were caused by Detective Loucks, who is independent of the prosecutor's office. Petitioner has failed to prove that the prosecution was aware of either. And again, both the relocation payment and the dismissal of the warrant occurred after Knowles provided testimony in this case.

Finally, Petitioner cannot show "there is any reasonable likelihood that the [alleged] false testimony could have affected the judgment of the jury." *Coe*, 161 F.3d at 343. That is because the jury was made aware of both these facts through Detective Loucks's testimony. During the second trial, Detective Loucks testified that he paid Knowles $800 to assist in relocation and that he assisted in having Knowles's warrant dismissed. So, even though Knowles's testimony did not include these facts, the jury was aware of this information and could consider them in deliberations. Therefore, even if the Court were to consider this claim on the merits, it would fail.

### D. Erroneous jury instructions regarding definition of a "school zone" violated Petitioner's due process rights

#### 1. Statute of Limitations

Petitioner contends that the statute of limitations should be equitably tolled for this claim. For the reasons set forth above in Section A.2.a, that argument is not well-taken. Thus, this claim is barred by the statute of limitations and should not be considered on the merits.

#### 2. Procedural Default

Petitioner concedes that his claim is procedurally defaulted but argues that this Court's failure to consider this claim will result in a fundamental miscarriage of justice, a recognized exception to procedural default. Petitioner seeks to invoke this exception arguing he was wrongly convicted of the school zone enhancement because the jury found him guilty of that enhancement absent a proper jury instruction, and so he is actually innocent of the enhancement. (Doc. 39 at 33.) Petitioner offers no argument or evidence of his purported actual innocence.

"A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006). In order to prove actual innocence, a petitioner must present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Petitioner must "show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327. Importantly, "'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998).

Here, Petitioner fails to establish his claim of factual innocence as necessary to overcome his procedural default. First, he identifies no evidence, new or otherwise, that proves that the transactions at issue in this case did not happen within 1,000 feet of the real property that comprises

an elementary school. Although the prosecution would have had the burden to establish this fact at trial, "actual innocence" puts the burden on Petitioner to show that he is not, in fact, guilty of the enhancement. Petitioner offers no evidence to show this and, appears to argue only that the jury instructions were legally insufficient. But legal insufficiency is not enough. Therefore, Petitioner cannot overcome his procedural default.

### 3.      Merits

Even if the Court were to consider the merits of Petitioner's claim, it would still deny it. As discussed above, the jury instruction as to the enhancement did not contain the statutory definition of school zone and thus was incomplete.

In order to receive habeas relief based on an erroneous jury instruction, the instruction must have "'so infected the entire trial that the resulting conviction violates due process.'" *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). When the claim of error is the omission of an element of the offense from a jury instruction, the error is harmless "where the reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error." *Neder v. United States*, 527 U.S. 1, 17 (1999).

At trial, Petitioner focused the attack on the prosecution's alleged failure to prove, beyond a reasonable doubt, that the transactions occurred in a school zone. (Doc. 12-7 at 121-23). He did not offer any affirmative evidence that the transactions did not occur in a school zone, that the buildings the prosecution alleged to be schools were not, in fact, schools, or that the affirmative evidence offered by the prosecution (which included a map showing the location of the schools and the transactions) was factually incorrect.

Based on the Court's review of the record, this element was supported by overwhelming and unrebutted evidence. The prosecution introduced through testimony evidence in the form of a map depicting the location of the transactions and each transaction's relation to schools. The testimony as to the transactions at issue placed each within 1000 feet of any school. (*See* Doc. 12-6 at 91-92.) Additionally, the prosecution made clear to the jury during its examination of the witness that the 1000-foot boundary was mandated by law. (*Id.* at 88-89.) Based on the evidence before the jury, this Court cannot say that Petitioner has proven any error other than harmless error.

**E.      Evidence was insufficient to support convictions because the jury was not properly instructed with the definition of "school zone"**

Petitioner makes an insufficiency of the evidence argument based on the fact that the jury instructions did not define a school zone. Petitioner contends that the evidence was thus insufficient to supporting a finding of guilt beyond a reasonable doubt on the school zone enhancement. Petitioner further argues that the state appellate court's failure to consider whether the jury instruction properly apprised the jury of the definition of a school zone, and instead to consider only whether there was sufficient evidence to connect the drug transaction to an operating school, was an unreasonable determination of the facts.

**1.      Procedural Default**

First, Petitioner's current iteration of this claim, that insufficient evidence supports the enhancement conviction because of the incomplete jury instructions, was never presented to the state courts and is therefore procedurally defaulted. *See Seymour*, 224 F.3d at 549-50. On appeal, Petitioner argued only that there was insufficient evidence to show that the transactions occurred within the requisite distance of an operating school. He did not argue that the jury instructions were incomplete and thus rendered the conviction unsupported by sufficient evidence. Thus,

because he never gave the state courts the opportunity to rule on this claim, he is prohibited from doing so here.

### 2.      Merits

Second, Petitioner's claim fails on the merits.  Sufficient evidence exists to support a conviction if, when "viewing the trial testimony and exhibits in the light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of a crime beyond a reasonable doubt." *Brown*, 567 F.3d at 205 (citing *Jackson*, 443 U.S. at 319) (emphasis in original).  Here, the prosecution introduced evidence placing each transaction within 1000 feet of a school.  (Doc. 12-6 at 85-88, 91-92; Doc. 12-9 Exs. 12a-b.)  This evidence is sufficient to have supported the conviction for the enhancement under a proper jury instruction.    Thus, Petitioner's insufficiency of the evidence claim also fails on the merits.

## F.      Certificate of Appealability

To the extent Petitioner wants to seek a certificate of appealability as to the claims the Court recommends denying, the Court recommends against its issuance.  The district court must decide whether a certificate of appealability ("COA") should issue when it enters a judgment adverse to a petitioner.  Rules Governing 2254 Cases, Rule 11(a).  A COA should issue if a petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  When a court has rejected a petitioner's claims on the merits, the requisite substantial showing is satisfied when the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong.  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  When a court has denied the claims on procedural grounds, without analyzing the underlying constitutional claims, "a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the

denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

Here, none of Petitioner's claims warrant the issuance of a COA. The Court has analyzed several of Petitioner's claims on the merits. As demonstrated in the Court's analysis above, Petitioner has failed to demonstrate even a debatable constitutional violation.

This Court also decided several claims on procedural grounds. Petitioner similarly cannot show either that a constitutional violation occurred to support any of these claims or that the Court's procedural ruling was arguably incorrect. These claims are undoubtedly procedurally defaulted.

Therefore, this Court recommends against issuing a COA pertaining to claims it finds without merit.

## <u>CONCLUSION</u>

For the above reasons, it is **RECOMMENDED** that Petitioner's Petition for Writ of Habeas Corpus as to his claim of ineffective assistance of counsel pertaining to counsel's failure to request a facilitation instruction be **GRANTED** and the remaining claims be **DENIED**.

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

This 4th day of September, 2018.

Signed By:

J. Gregory Wehrman

United States Magistrate Judge